No. 25-60330

_____

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

_____

APEX CLEARING CORPORATION,

*Petitioner,*

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

_____

On Petition for Review of an Order of the
Securities and Exchange Commission
Securities Exchange Act of 1934 Release No. 102860;
Investment Advisers Act of 1940 Release No. 6874

_____

## OPENING BRIEF FOR PETITIONER

_____

Christopher R. Mills
 *Counsel of Record*
David S. Petron
Jeremy D. Rozansky
SIDLEY AUSTIN LLP
1501 K St. NW
Washington, DC 20005
Tel: (202) 736-8875
cmills@sidley.com

Philip H. DeVoe
SIDLEY AUSTIN LLP
787 Seventh Ave.
New York, NY 10019

*Counsel for Petitioner Apex Clearing Corporation*

September 9, 2025

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

## I.    Petitioner

Petitioner Apex Clearing Corporation (a private company) is a subsidiary of parent corporation Apex Fintech Solutions Inc. (direct), PEAK6 APX Holdings LLC (indirect), and PEAK6 Investments LLC (indirect), and no publicly traded corporation owns 10% or more of Apex Clearing Corporation's stock.

## II.    Respondent

The Securities and Exchange Commission is an agency of the federal government.

## III.    Interested parties

### A. Attorneys for Petitioner

- Christopher R. Mills (Counsel for Petitioner)

- David S. Petron (Counsel for Petitioner)

i

- Jeremy D. Rozansky (Counsel for Petitioner)

- Philip H. DeVoe (Counsel for Petitioner)

- Sidley Austin LLP (Counsel for Petitioner)

**B. Attorneys for Respondent**

- Daniel Matro (Counsel for the Securities and Exchange Commission)

**C. Other interested parties.**

The following firms, while not parties to this appeal, had their motions denied in the same order of the Securities and Exchange Commission that denied the motion of Apex Clearing Corporation.  As a result, they may have an interest in the outcome of this litigation.

- William Blair & Company, L.L.C.

- William Blair Investment Management, LLC

- Robert W. Board & Co., Inc.

- Key Investment Services LLC

- KeyBanc Capital Markets Inc.

- Oppenheimer & Co. Inc.

- Hilltop Securities Inc.

- Piper Sandler & Co.

- Osaic Services, Inc.

- Osaic Wealth, Inc.

- Truist Securities, Inc.

- Truist Investment Services, Inc.

- Truist Advisory Services, Inc.

- Raymond James & Associates, Inc.

- RBC Capital Markets, LLC

- Ameriprise Financial Services, LLC

- LPL Financial LLC

- Regions Securities LLC

- Invesco Distributors, Inc.

- Invesco Advisers, Inc.

- Stifel, Nicolaus & Company, Inc.

Additionally, the following firms, while not parties to this appeal, had their motions denied in an order of the Securities and Exchange Commission issued after, and relying upon, the order denying the motion of Apex Clearing Corporation. As a result, they may have an interest in the outcome of this litigation.

- Nuveen Securities, LLC

- Perella Weinberg Partners LP; Tudor, Pickering, Holt & Co. Securities LLC

- Perella Weinberg Partners Capital Management LP

- Kroll Bond Rating Agency, LLC

- Northwestern Mutual Investment Services, LLC

- Northwestern Mutual Investment Management Company, LLC

- Mason Street Advisors, LLC

- The Huntington Investment Company

- Huntington Securities, Inc.

- Capstone Capital Markets LLC

Dated:  September 9, 2025

/s/ *Christopher R. Mills*
Christopher R. Mills

*Attorney of Record for Petitioner*
*Apex Clearing Corporation*

iv

# REQUEST FOR ORAL ARGUMENT

Oral argument would assist this Court. This case raises important questions about the obligations of agencies to ensure that industry-wide enforcement sweeps are conducted fairly, that any remedies are imposed in an even-handed way, and that any apparently disparate treatment is well-explained and justified, as required by the Administrative Procedure Act. More generally, oral argument would assist this Court in addressing substantive questions about Securities and Exchange Commission remedies and procedure.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS..........................................i

REQUEST FOR ORAL ARGUMENT........................................................ v

TABLE OF CONTENTS .......................................................................vi

TABLE OF AUTHORITIES ...............................................................viii

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT .......................................................6

STATEMENT OF ISSUES....................................................................6

STATEMENT OF THE CASE ...............................................................7

    A.    The Off-Channel Communications Enforcement Sweep........7

    B.    The SEC Insists on Take-It-Or-Leave-It Standard Settlements in Enforcement Sweeps....................................10

    C.    The SEC Materially Changes the Off-Channel Sweep's Settlement Terms in January 2025. .....................................14

    D.    Apex Seeks to Modify Its Order To Ensure Equitable Treatment............................................................................16

    E.    The SEC's Order........................................................................20

        1.    Two Commissioners Deny the Motion. ........................20

        2.    Commissioner Peirce Dissents. ...................................24

        3.    Petition for Review.......................................................27

        4.    June "Clean-Up" Order.................................................28

SUMMARY OF ARGUMENT ...............................................................28

STANDARD OF REVIEW ......................................................................... 32

ARGUMENT ......................................................................................... 35

I.   The Commission's Refusal to Treat Similarly Situated Firms Similarly Is Arbitrary. ................................................................. 35

II.  The Commission Did Not Engage in Reasoned Decisionmaking. ............................................................................. 38

    A.   The Commission Fails to Justify the Undertakings, Relying Instead on Conclusory Rationales. .......................... 40

    B.   The Commission Ignored the "Important" Enforcement-Sweep Context ....................................................................... 45

    C.   The Commission Erred By Concluding Apex Failed to Show "Changed Circumstances." ......................................... 50

    D.   The Commission Deviated From Its Precedents, Which Regard "Inequitable" Orders as Warranting Modification. ........................................................................ 54

    E.   The Commission's Failure to Define the Criteria It Applied Is Arbitrary and Capricious. ................................... 60

III.  The Commission's Requirement that Apex File a Motion to Reopen Contradicts Commission Rules and Precedents. .............. 63

CONCLUSION .......................................................................................... 65

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA Int'l v. FCC*,
  885 F.3d 687 (D.C. Cir. 2018) .......................................... 61

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
  522 U.S. 359 (1998) ...................................................... 38

*Allina Health Servs. v. Sebelius*,
  756 F. Supp. 2d 61 (D.D.C. 2010) ...................................... 42

*Am. Petrol. Inst. v. EPA*,
  661 F.2d 340 (5th Cir. 1981) ............................................ 58

*Am. Sec. Ass'n v. SEC*,
  No. 23-13396, 2025 WL 2092054 (11th Cir. July 25, 2025) ......... 46, 62

*ANR Storage Co. v. FERC*,
  904 F.3d 1020 (D.C. Cir. 2018) ......................................... 40

*Associated Marine Equip. LLC v. Jones*,
  301 F. App'x 346 (5th Cir. 2008) ....................................... 44

*Bechtel v. FCC*,
  957 F.2d 873 (D.C. Cir. 1992) .......................................... 47

*Bragdon v. Abbott*,
  524 U.S. 624 (1998) ...................................................... 51

*Burlington N. & Santa Fe Ry. v. Surface Transp. Bd.*,
  403 F.3d 771 (D.C. Cir. 2005) .......................................... 40

*Chamber of Com. v. SEC*,
  85 F.4th 760 (5th Cir. 2023) ....................................... 5, 32, 33, 50, 54

*Chem. Mfrs. Ass'n v. EPA*,
  870 F.2d 177 (5th Cir. 1989) ........................................ 45, 49

*Collins v. SEC*,
    736 F.3d 521 (D.C. Cir. 2013) ............................................................. 35

*Cummings v. Greater Cleveland Reg'l Transit Auth.*,
    865 F.3d 844 (6th Cir. 2017) ......................................................... 44, 45

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
    45 F.4th 846 (5th Cir. 2022) ........................................................ 34, 41

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ........................................................................... 4

*Efe v. Ashcroft*,
    293 F.3d 899 (5th Cir. 2002) ............................................................. 54

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ................................................................... 34, 54

*Grayscale Invs., LLC v. SEC*,
    82 F.4th 1239 (D.C. Cir. 2023) ........................................................... 3

*Hall v. Schweiker*,
    660 F.2d 116 (5th Cir. 1981) ........................................................ 34, 63

*Hesling v. CSX Transp., Inc.*,
    396 F.3d 632 ................................................................... 29, 30, 44

*Horne v. Flores*,
    557 U.S. 433 (2009) .......................................................................... 62

*Huawei Techs. USA, Inc. v. FCC*,
    2 F.4th 421 (5th Cir. 2021) ............................................................... 60

*Kisor v. Wilkie*,
    588 U.S. 558 (2019) ......................................................................... 64

*Lowry Dev., L.L.C. v. Groves & Assocs. Ins., Inc.*,
    690 F.3d 382 (5th Cir. 2012) ............................................................. 44

*Lucia v. SEC*,
    585 U.S. 237 (2018) ......................................................................... 58

*Martin v. Franklin Cap. Corp.*,
    546 U.S. 132 (2005) ............................................................................. 60

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................ 4, 5, 30, 33, 38, 39, 40, 45

*Nat'l Ass'n of Priv. Fund Managers v. SEC*,
    No. 23-60626, 2025 WL 2434051 (5th Cir. Aug. 25, 2025) ..... 34, 49, 62

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ............................................................................. 41

*Noranda Alumina, LLC v. Perez*,
    841 F.3d 661 (5th Cir. 2016) ................. 4, 29, 31, 33, 35, 37, 58, 60, 65

*Northridge Church v. Charter Twp. of Plymouth*,
    647 F.3d 606 (6th Cir. 2011) ................................................................ 43

*Pac. Molasses Co. v. FTC*,
    356 F.2d 386 (5th Cir. 1966) .......................................................... 32, 34

*PDK Lab'ys Inc. v. DEA*,
    438 F.3d 1184 (D.C. Cir. 2006) ........................................................... 31

*Pearson v. Shalala*,
    164 F.3d 650 (D.C. Cir. 1999) ............................................................. 61

*PPL Wallingford Energy LLC v. FERC*,
    419 F.3d 1194 (D.C. Cir. 2005) ........................................................... 50

*Rapoport v. SEC*,
    682 F.3d 98 (D.C. Cir. 2012) .................................................... 31, 60, 62

*Rufo v. Inmates of Suffolk Cnty. Jail*,
    502 U.S. 367 (1992) ........................................................................ 21, 51

*SEC v. Alexander*,
    No. 06–CV–3844, 2013 WL 5774152 (E.D.N.Y. Oct. 24,
    2013) ..................................................................................................... 43

*SEC v. Lewis*,
423 F. Supp. 2d 337 (S.D.N.Y. 2006)..................................................52

*Seven Elves, Inc. v. Eskenazi*,
635 F.2d 396 (5th Cir. 1981) ............................................................44

*Sierra Club v. EPA*,
939 F.3d 649 (5th Cir. 2019) ............................................................39

*Smith v. Davis*,
953 F.3d 582 (9th Cir. 2020) ............................................................59

*Susquehanna Int'l Grp., LLP v. SEC*,
866 F.3d 442 (D.C. Cir. 2017) .......................................................5, 62

*Sw. Elec. Power Co. v. EPA*,
920 F.3d 999 (5th Cir. 2019) ............................................................45

*Texas v. United States Envtl. Protection Agency*,
137 F.4th 353 (5th Cir. 2025) .......................................................6, 64

*United States v. Maciel-Alcala*,
612 F.3d 1092 (9th Cir. 2010) ..........................................................61

*United States v. W. Elec. Co.*,
46 F.3d 1198 (D.C. Cir. 1995) ..........................................................52

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
985 F.3d 472 (5th Cir. 2021)................... 1, 4, 29, 35, 36, 37, 38, 40, 57

*Westar Energy, Inc. v. FERC*,
473 F.3d 1239 (D.C. Cir. 2007) .....................................................32, 64

*Zhang v. Gonzales*,
452 F.3d 167 (2d Cir. 2006) ..............................................................36

## Statutes & Regulations

5 U.S.C. § 706(2) .........................................................................28, 32

15 U.S.C. § 78o(b)(4) .........................................6, 16, 32, 38, 42, 43

15 U.S.C. § 78u-3 ................................................................. 6

15 U.S.C. § 78y(a) ............................................................ 6, 33

15 U.S.C. § 78y(b)(4) ........................................................... 32

17 C.F.R. § 201.200(d)(1) ................................................. 32, 63

17 C.F.R. § 240.17a-4(b)(4) .................................................... 8

17 C.F.R. § 275.204-2 ........................................................... 8

**Rules**

Fed. R. Civ. P. 60(b) ....................................................... 22, 43

FINRA Rule 9523(b) ............................................................. 14

**Securities and Exchange Commission Orders**

*In re Certain Off-Channel Commc'ns Settled Orders*,
　　Rel. No. 34-103330 (June 26, 2025) .................................... 28

*In re Charles Schwab & Co., Inc.*,
　　Rel. No. 34-102172 (Jan. 13, 2025) ................................... 15

*In re F.X.C. Invs. Corp. & Francis X. Curzio*, Rel. No. ID-218
　　(Dec. 9, 2002) ....................................................... 55

*In re Fred F. Liebau, Jr.*,
　　Rel. No. 34-92353 (July 8, 2021) ..................................... 55

*In re Janus Cap. Mgmt., LLC*,
　　Rel. No. IAA-3065 (Aug. 5, 2010) ..................................... 57

*In re MDC Holdings, Inc.*,
　　Rel. No. 34-39537 (Jan. 9, 1998) ..................................... 57

*In re Mass. Fin. Servs. Co.*,
　　Rel. No. IAA-3312 (Nov. 9, 2011) .................................. 56, 57

*In re Michael Johnson*,
　　Rel. No. 33-9797 (May 29, 2015) ...................................... 64

*In re Michael H. Johnson,*
  Rel. No. 34-75894 (Sept. 10, 2015) ..................................................... 48

*In re Millennium Partners, L.P.,*
  Rel No. 34-52863, 2005 WL 3240598 (Dec. 1, 2005)..................... 55, 56

*In re Millennium Partners, L.P.,*
  Rel. No. 34-78364 (July 19, 2016) ......................................... 42, 54, 56

*In re Petroteq Energy, Inc.,*
  Rel. No. 34-96117 (Oct. 20, 2022) ......................................................... 63

*In re Putnam Inv. Mgmt., LLC,*
  Rel. No. IAA-3600 (May 3, 2013) .......................................................... 56

*In re Richard D. Feldmann,*
  Rel. No. 34-77803 (May 10, 2016) ......................................................... 46

*In re S.A.C. Cap. Advisors,*
  Rel. No. IAA-4287 (Dec. 3, 2015) .......................................................... 63

*In re Sandeep Goyal,*
  Rel. No. IAA-4339 (Feb. 23, 2016) ........................................................ 64

*In re Santander US Cap. Mkts. LLC,*
  Rel. No. 34-102171 (Jan. 13, 2025) ....................................................... 15

## Scholarly Authorities

Thad A. Davis, *A New Model of Securities Law Enforcement,*
  32 Cumb. L. Rev. 69 (2001) ................................................................... 9

Anat Carmy-Wiechman, et al., *SEC Cases and Actions: A
  Different Way to Measure Securities Enforcement,*
  80 Bus. Law. 133 (2025) ........................................................................ 9

## Other Authorities

Robert Cook & Greg Ruppert, FINRA*, SEC Off-Channel
  Communications Settlements—SRO Collateral
  Consequences* (May 8, 2025), https://tinyurl.com/2bwyp5a2........ 15, 29

Sanjay Wadhwa, *Remarks at SEC Speaks 2024*
(Apr. 3, 2024), https://tinyurl.com/nhh43jfe ................................. 10, 11

SEC Off. of Inspector Gen., *Special Review: Avoidable Errors
Led to the Loss of Former SEC Chair Gary Gensler's Text
Messages*, Rep. No. 587 (2025).................................................................. 1

SEC Press Release, *Paul S. Atkins Sworn in as SEC
Chairman* (Apr. 21, 2025), https://tinyurl.com/4f4z2423 ................... 20

SEC Press Release, *SEC Announces Departure of
Enforcement Director Gurbir S. Grewal* (Oct. 2, 2024),
https://tinyurl.com/2bun2c2r ......................................................... 7, 10

SEC Press Release, *SEC Charges Four Investment Advisers
for Pay-to-Play Violations Involving Campaign
Contributions* (Sept. 15, 2022), https://tinyurl.com/mspy-
jpct ................................................................................................ 10

SEC Press Release, *SEC Charges JPMorgan, UBS, and
TradeStation for Deficiencies Relating to the Prevention of
Customer Identity Theft* (July 27, 2022), https://ti-
nyurl.com/2fz4swpt ........................................................................... 9

SEC Press Release, *SEC Charges Two Advisory Firms for
Custody Rule Violations, One for Form ADV Violations,
and Six for Both* (Sept. 9, 2022), https://tinyurl.com/3bes-
sepw ............................................................................................... 10

## INTRODUCTION

"It is a bedrock principle of administrative law that an agency must treat like cases alike." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 479 (5th Cir. 2021) (quotation marks and citations omitted). Over the last several years, and following the rapid, sudden shift to remote work caused by the COVID-19 pandemic, the Securities and Exchange Commission conducted an "enforcement sweep" across the financial services industry to detect and sanction firms for similar violations of SEC rules regarding the preservation of business-related text messages and other employee communications made on personal devices.[1]

As part of the sweep, the SEC brought settled administrative enforcement actions against more than 75 broker-dealers, including Peti-

_____

[1] Financial services firms were not the only ones who experienced recordkeeping challenges during this period. As the SEC's Inspector General recently announced, the SEC itself inappropriately "erased nearly a year's worth of text messages sent and received by the then SEC Chair, Gary Gensler," resulting "in the inadvertent loss of text messages sent and received by Gensler between October 18, 2022, and September 6, 2023." SEC Off. of Inspector Gen., *Special Review: Avoidable Errors Led to the Loss of Former SEC Chair Gary Gensler's Text Messages*, Rep. No. 587, at I (2025).

1

tioner Apex Clearing Corporation ("Apex").  Each action involved materially indistinguishable facts and violations and, consistent with its normal approach in enforcement sweeps, from 2022 to 2024, the SEC treated like cases alike by imposing a uniform suite of remedies to resolve each matter on nearly identical terms.

For each broker-dealer who settled during that period, the SEC insisted on a form administrative order with standardized findings, a civil money penalty tied to the firm's size, a cease-and-desist order, a censure, and a set of mandatory actions—known in SEC parlance as "undertakings"—not otherwise required by the federal securities laws. None of this was negotiable.

The SEC abruptly changed course in January 2025, when as part of the same enforcement sweep it entered settled orders against additional firms, including several broker-dealers.  Although those January 2025 settlements (the "January 2025 Orders") involved the same violations of the same rules by the same kind of firms, the SEC imposed substantially less burdensome sanctions than it had in the scores of prior settlements with other broker-dealers in the very same sweep.  Whereas

2

for Apex and the others, the SEC had mandated the firm hire an independent compliance consultant and abide by that consultant's directives, the January 2025 Orders did not require the identically situated broker-dealers to retain such a consultant at all.  Similarly, while from 2022 to 2024 all the broker-dealers caught in the enforcement sweep were required to report internal disciplinary matters to the SEC, the January 2025 Orders required no such thing.  And the 2022 to 2024 orders were structured in a way that created massive collateral consequences for the Financial Industry Regulatory Authority's ("FINRA") regulation of the settling broker-dealers, including onerous "heightened supervision" by FINRA that could stretch on for years.  The January 2025 Orders spared the broker-dealers of these FINRA consequences.

To vindicate the "great principle that like cases must receive like treatment" that is "blackletter administrative law," *Grayscale Invs., LLC v. SEC,* 82 F.4th 1239, 1245 (D.C. Cir. 2023) (citation modified), Apex and others adversely affected by the policy change moved to modify aspects of their orders so that, prospectively, they would be subject to undertakings similar to those imposed on the similarly situated broker-dealers who

settled in January 2025.  But by a two-to-one vote, the SEC denied those motions in a single, omnibus order (the "Order").

The Order is arbitrary and capricious and should be vacated.  For starters, the SEC explicitly refused to "treat like cases alike." *Univ. of Tex. M.D. Anderson Cancer Ctr.*, 985 F.3d at 479.  "[A]dministrative agencies must apply the same basic rules to all similarly situated supplicants."  *Noranda Alumina, LLC v. Perez*, 841 F.3d 661, 665 (5th Cir. 2016).  Yet the Order shirks this obligation and instead affirms the SEC's arbitrary and inequitable policy of imposing onerous undertakings on some broker-dealers and milder requirements on others, despite all relevant settlements arising from the same enforcement sweep and involving materially indistinguishable conduct.

The Order is also arbitrary and capricious because the SEC failed "to engage in reasoned decisionmaking" several times over.  *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citation modified).  It provides inadequate, *ipse dixit* explanations for the disparate treatment.  It lacks a "rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  It ignores an "important aspect of the problem"—*i.e.*,

the entire context of the enforcement sweep. *Id.* It misapplies caselaw that purports to guide its analysis. It flunks the requirement to "provide a response to significant points" raised by the parties. *Chamber of Com. v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023). It deviates from prior SEC decisions on arbitrary and unsupportable grounds, and in doing so fails to identify any comprehensible governing standard. In short, this is yet another SEC action where a "lack of reasoned decisionmaking recurs throughout the [SEC's] Order." *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 449 (D.C. Cir. 2017). Each of these are grounds for granting Apex's petition and vacating the Order denying the motion to modify the undertakings.

Finally, to underscore the arbitrary nature of the Order's reasoning, the Order invents a requirement that Apex was required to file a separate motion to reopen proceedings before it could file its motion to modify the underlying order. The Order does not even attempt to locate such a requirement in the SEC's rules, the SEC has not imposed such a requirement in previous matters, and the SEC has previously interpreted the rule Apex invoked—Rule 200(d) of the SEC Rules of Practice—to modify undertakings in settled actions without requiring any motion to

5

reopen. Such "[u]nexplained inconsistency" is also "a reason for holding agency action to be arbitrary and capricious." *Texas v. EPA*, 137 F.4th 353, 374 (5th Cir. 2025).

For all these reasons, the Petition should be granted and the Order should be vacated and set aside.

## JURISDICTIONAL STATEMENT

The SEC had subject-matter jurisdiction over this matter under Sections 15(b) and 21C of the Exchange Act, 15 U.S.C. §§ 78o(b), 78u-3, and denied Apex's motion to modify or amend, and thereby disposed of all the parties' claims, in a final order dated April 14, 2025. RE.1–12; JA005–16. The Court has jurisdiction to review such an order pursuant to Section 25(a) of the Exchange Act. 15 U.S.C. § 78y(a). The petition was timely filed on June 13, 2025.

## STATEMENT OF ISSUES

1.    Whether the SEC acted contrary to law, arbitrarily, or capriciously by failing to equalize the prospective remedies for similarly situated broker-dealers settling materially identical claims in the same enforcement sweep.

6

2.    Whether the SEC acted contrary to law, arbitrarily, or capriciously by failing to engage in reasoned decisionmaking and to provide an adequate explanation for its unequal treatment of broker-dealers in the same enforcement sweep.

3.    Whether the SEC acted contrary to law, arbitrarily and capriciously, or without observance of procedure required by law by concluding that Apex needed to file a motion to reopen proceedings before seeking modification of the underlying order.

## STATEMENT OF THE CASE

### A.    The    Off-Channel    Communications    Enforcement    Sweep

Starting in 2021, the SEC initiated a sweep to enforce compliance with its rules regarding recordkeeping for communications, focused on retention by regulated firms of business-related communications on personal devices of their employees.[2]  Under Securities Exchange Act of 1934 ("Exchange Act") Rule 17a-4(b)(4), broker-dealers must "preserve . . .

---

[2] *See* SEC Press Release, *SEC Announces Departure of Enforcement Director Gurbir S. Grewal* (Oct. 2, 2024) [hereinafter *Grewal Departure Press Release*], https://tinyurl.com/2bun2c2r; SEC Press Release, *JPMorgan Admits to Widespread Recordkeeping Failures and Agrees to Pay $125 Million Penalty to Resolve SEC Charges* (Dec. 17, 2021), RE.13–14.

7

[o]riginals of all communications received and copies of all communications sent" by the broker-dealer "relating to its business as such." 17 C.F.R. § 240.17a-4(b)(4). Other types of SEC registrants are subject to similar recordkeeping requirements. *See, e.g.*, 17 C.F.R. § 275.204-2. An email sent by a broker-dealer's employee using the employee's corporate email account is a prototypical type of communication that the broker-dealer can be required to retain. Those types of communications, sent through approved corporate channels, differ from text messages, iMessages, and other types of written communications sent or received through platforms or channels (such as personal accounts) the broker-dealer has not approved for corporate use. The latter type of communications are referred to by the SEC as "off-channel communications." *In re Apex Clearing Corp.*, Rel. No. 34-100702, at 2 (Aug. 14, 2024) [hereinafter Settled Order], JA032.

Enforcement sweeps are one approach the SEC takes to enforcing the federal securities laws. Unlike most SEC enforcement investigations and settled enforcement actions—which are discrete, standalone matters focusing on potential conduct or violations that are unique to the relevant respondent—sweeps typically involve "a group of enforcement actions

8

brought simultaneously against different parties who have engaged in similar violations." Andrew J. Ceresney, Dir., SEC Div. of Enf't, *The Impact of SEC Enforcement on Public Finance* (Oct. 13, 2016) [hereinafter *Ceresney Speech*], RE.35; *see also* Gurbir S. Grewal, Dir., SEC Div. of Enf't, *Remarks at Securities Enforcement Forum* (Nov. 15, 2022), RE.45 (distinguishing enforcement sweeps and "separate standalone cases"). Armed with "a single substantive legal issue" and intending to file "multiple coordinated enforcement actions," the SEC considers all respondents to be materially equal. Anat Carmy-Wiechman et al., *SEC Cases and Actions: A Different Way to Measure Securities Enforcement*, 80 Bus. Law. 133, 175 (2025); Thad A. Davis, *A New Model of Securities Law Enforcement*, 32 Cumb. L. Rev. 69, 85 (2001).

Due to the commonality of issues and equitable considerations, the SEC commonly uses one-size-fits-all orders and sanctions in its sweeps. *See Ceresney Speech*, RE.35 (explaining how the SEC "offered standard settlement terms" in a recent sweep); *see also* SEC Press Release, *SEC Charges JPMorgan, UBS, and TradeStation for Deficiencies Relating to the Prevention of Customer Identity Theft* (July 27, 2022), https://tinyurl.com/2fz4swpt (identical non-monetary sanctions in three settled

orders in Regulation S-ID sweep); SEC Press Release, *SEC Charges Two Advisory Firms for Custody Rule Violations, One for Form ADV Violations, and Six for Both* (Sept. 9, 2022), https://tinyurl.com/3bessepw (identical non-monetary sanctions in nine settled orders in custody rule sweep); SEC Press Release, *SEC Charges Four Investment Advisers for Pay-to-Play Violations Involving Campaign Contributions* (Sept. 15, 2022), https://tinyurl.com/mspyjpct (identical non-monetary sanctions in four settled orders in pay-to-play rule sweep). In this respect, settlements related to sweeps are materially different from settlements in standalone enforcement actions for which settled orders are not standardized but instead are often heavily negotiated between the SEC and the respondent.

## B. The SEC Insists on Take-It-or-Leave-It Standard Settlements in Enforcement Sweeps.

Like previous enforcement sweeps, the SEC adopted a standardized approach to settling matters as part of its off-channel communications sweep.[3] Among other things, as a matter of policy, it demanded that

---

[3] *See Grewal Departure Press Release* (calling the off-channel communications enforcement sweep a unified "initiative"); Sanjay Wadhwa,

firms agree to standardized orders describing a uniform set of violations in uniform terms and imposing uniform sanctions. Intentionally, none of those terms were open for negotiation. With an understanding that similarly situated firms would be treated similarly, scores of firms settled with the SEC on equal terms in "waves" of settled orders from 2022 through 2024 as part of the off-channel enforcement sweep. RE.13–31 (collecting SEC press releases for each "wave").

Apex was one of 26 firms that settled with the SEC as part of the SEC's August 14, 2024, wave of settlements. SEC Press Release, *Twenty-Six Firms to Pay More Than $390 Million Combined to Settle SEC's Charges for Widespread Recordkeeping Failures* (Aug. 14, 2024), RE.25–27. Consistent with the sweep's uniform approach to settlements, Apex and the other broker-dealers settled under the standard terms that imposed standardized remedies. Settled Order at 1, JA031.

Like other settling broker-dealers, Apex agreed to pay a civil money penalty—Apex's was $6 million. Settled Order at 9, JA039. In addition, like the other settlements, the SEC ordered Apex to comply with several

---

Deputy Dir., SEC Div. of Enf't, *Remarks at SEC Speaks 2024* (Apr. 3, 2024), https://tinyurl.com/nhh43jfe (same).

pages of standardized undertakings as a sanction—*i.e.*, affirmative actions Apex was ordered to take. *Id.* at 5–9, JA035–39.

Among other things, the SEC ordered Apex to retain an independent compliance consultant to conduct multi-year reviews of Apex's recordkeeping practices. *Id.* at 5, JA035. The Settled Order specifies the compliance consultant's costly and intrusive rights and duties. The consultant must review all of "Apex Clearing's supervisory, compliance, and other policies and procedures" related to electronic communications, review all "training conducted" related to the same, assess all of Apex's "surveillance program measures" instituted to ensure compliance, assess Apex's "technological solutions" (including assessing the "likelihood that Apex Clearing personnel will use" those solutions), assess Apex's other preventative measures including reviewing "technology and/or behavioral restrictions" in Apex's policies and procedures, review Apex's "electronic communications surveillance routines," and conduct a comprehensive review of Apex's "framework" for addressing employee non-compliance, including a survey "of how Apex Clearing determined which employees failed to comply with Apex Clearing policies and procedures, the corrective action carried out, an evaluation of who violated policies and

why, what penalties were imposed, and whether penalties were handed out consistently across business lines and seniority levels." *Id.* at 5–6, JA035–36.

But the compliance consultant would not merely "review" and "assess." Rather, Apex *had to implement* the compliance consultant's recommendations. *Id.* Further, Apex could not replace the compliance consultant without written authorization from the SEC staff.

Second, also creating an obligation that otherwise does not exist under the federal securities laws, Apex was ordered to notify the SEC staff promptly after disciplining any employee for any violation of any policy or procedure "concerning the preservation of electronic communications." *Id.* at 8, JA038. The obligation to promptly notify the SEC covers even minor internal compliance activities, like the issuance of "written warnings." *Id.*

Finally, like the prior settlements connected to the sweep, the SEC *ordered* that Apex comply with the undertakings. *Id.* at 9, JA039. This structural decision by the SEC—which is not legally required and often excluded from settled orders with undertakings—imparted significant collateral consequences. Broker-dealers like Apex are required under the

13

federal securities laws to be members of FINRA. But, because of the manner in which FINRA rules and SEC settlements interact, broker-dealers that are ordered to comply with undertakings in SEC settlements are immediately disqualified from FINRA membership and must apply to FINRA to "obtain approval from FINRA to enter or remain in the securities industry." FINRA Regulatory Notice 09-19, attach. B. Further, once that re-application is approved, the FINRA rules mandate heightened supervision—consisting of additional costly regulatory examinations, oversight, and obligations. *See* FINRA Rule 9523(b).

### C. The SEC Materially Changes the Off-Channel Sweep's Settlement Terms in January 2025.

After more than two years and dozens of settlements that followed a consistent policy, the SEC suddenly changed course on January 13, 2025, announcing sweep-related settlements with 12 more firms, including 3 broker-dealers, for violations materially indistinguishable from Apex's and others', yet imposing substantially less onerous sanctions. *See* SEC Press Release, *Twelve Firms to Pay More Than $63 Million Combined to Settle SEC's Charges for Recordkeeping Failures* (Jan. 13, 2025), RE.30–31.

Along with levying significantly lower civil money penalties, the SEC imposed much less burdensome undertakings on the settling broker-dealers compared to their similarly situated competitors who settled in prior waves. *See, e.g.*, *In re Charles Schwab & Co., Inc.*, Rel. No. 34-102172, at 7–8 (Jan. 13, 2025); *In re Santander US Cap. Mkts. LLC*, Rel. No. 34-102171, at 6–7 (Jan. 13, 2025). The SEC did not demand that they hire independent consultants to conduct multi-year reviews of their recordkeeping practices and report to SEC the results of that review. The SEC did not demand that they report disciplinary actions prospectively. *See id.* And the SEC did not order that they comply with the undertakings. Because compliance with the undertakings was not ordered, those broker-dealers entirely escape the costly and burdensome plans of heightened supervision with FINRA. *See* Robert Cook & Greg Ruppert, FINRA*, SEC Off-Channel Communications Settlements—SRO Collateral Consequences* (May 8, 2025) [hereinafter *FINRA Collateral Consequences Statement*], https://tinyurl.com/2bwyp5a2.

In issuing the January 2025 Orders, the SEC necessarily determined that requiring the more burdensome undertakings it imposed earlier on Apex and others was not necessary or appropriate to remedy the

violations, effectuate future compliance, protect investors, or otherwise serve "the public interest." 15 U.S.C. § 78o(b)(4).

### D.   Apex Seeks to Modify Its Order to Ensure Equitable Treatment.

Seeking to maintain the equal treatment that had been a funda-mental component of the sweep, Apex and several other firms responded quickly to the changed circumstances.  On January 30, 2025, they moved the SEC to narrowly modify aspects of their settled orders—but not the civil penalties, cease-and-desist orders, or censures—and to enter a stay pending the SEC's resolution.  *See* Mot. to Modify Ordered Undertakings at 1 (Jan. 30, 2025) [hereinafter Motion], JA053.  Pointing to the SEC's rules and precedents, Apex argued that "[t]he Commission is authorized to amend its orders when they are no longer equitable."  *Id.* at 5, JA057.  And Apex's settled order had become "no longer equitable" in light of the January 2025 Orders, which imposed substantially fewer "costs and bur-dens" on the settling parties, despite "materially the same" violations and "the Commission's historical insistence on uniform undertakings in con-nection with its off-channel initiative."  *Id.*  Apex explained "there is no just reason for . . . disparate treatment of similarly situated settling firms."  *Id.*

16

Apex also explained that it was "a condition of settlement," at least until the January 2025 Orders, that all settling broker-dealers in the sweep receive materially the same undertakings. *Id.* Because there was no material difference between Apex's conduct and that of the similarly situated firms subject to the January 2025 Orders, Apex urged that there was no just reason for the SEC to subject it to more onerous undertakings. *Id.* at 5–6, JA057–58. Further, Apex argued, the January 2025 Orders clarified that Apex's undertakings were more burdensome than necessary to remedy its conduct or serve the public interest. *Id.* at 6, JA058. Apex explained that by January 2025, the SEC had determined that the recordkeeping violations could "be appropriately addressed without" the burdensome undertakings to which it subjected Apex. *Id.*

Apex also identified SEC precedent for modification of its order under these circumstances. Apex pointed to examples of the SEC modifying orders in past sweeps where the undertakings "evolved over time." *Id.* at 6–7, JA058–59. In one case highlighted by Apex, *Millennium Partners*, the SEC relieved an entity of its ongoing obligations under a settlement for the purpose of conforming that entity's undertakings to "similar un-

dertakings in other administrative proceedings related to [the same conduct]." *Id.* at 7, JA059 (quoting *In re Millennium Partners L.P.*, Rel. No. 34-78364, at 2 (July 19, 2016)). Apex identified four other such cases. *Id.* at 7 n.17, JA059.

The SEC's Division of Enforcement responded in opposition on February 10, 2025. Although it did not dispute Apex's factual assertions, did not dispute that the SEC had imposed unequal and inequitable sanctions on similarly situated firms as part of the same enforcement sweep, and did not dispute that Apex's motion was procedurally proper under the SEC's rules, the Division asserted that the fact that each of the later settlors in the same enforcement sweep "received a better deal" was not an "exceptional" or "compelling" circumstance warranting modification of Apex's order. Div. of Enf't's Opp'n to Mot. ("Enf't Opp'n") at 3–4 (Feb. 10, 2025), JA069–70. The Division also contended, without evidence, that granting Apex's motion "would open the floodgates—inviting other respondents to relitigate all manner of settled Commission administrative proceedings—and, thus, would undermine the finality of the Commission's orders and the efficacy of the Commission's enforcement program." *Id.* at 2, JA068.

18

Apex's reply noted that "the Division of Enforcement does not dispute that [Apex] is similarly situated with those firms that have less burdensome undertakings, that the underlying conduct and violations in all relevant settlements were materially indistinguishable, or that—in light of the more recent settlements—the Commission has concluded that Respondent's undertakings are unnecessary to remedy the underlying violations, ensure prospective compliance, protect investors, or otherwise vindicate the public interest." Reply in Supp. of Mot. at 1 (Feb. 13, 2025) [hereinafter Reply], JA081.

Apex also explained that the Division failed to "cite any relevant authority for its argument that compelling circumstances do not exist here." *Id.* at 5, JA085. Instead, Apex showed that the Division drew inapt analogies, such as to cases where a party sought to amend its settlement based on the outcome of later, litigated proceedings and not, as here, instances where settling firms sought to harmonize the undertakings with those imposed "*in other settlements*" connected to the same sweep. *Id.* And Apex explained that, despite the Division's speculation, the "floodgates" were not at risk of being opened because "[t]he Commis-

sion for decades has granted the type of limited relief that [Apex] requests," and "[d]oing so has not led to a deluge of collateral attacks on settled actions and has not otherwise undermined the Commission's enforcement program." *Id.* at 6, JA086.

Apex also observed that the denial of its motion for modification "would actually cause the harm the Division seeks to avoid." *Id.* at 7, JA087. That is because "[i]n broad enforcement sweeps such as the off-channel communications initiative, an important consideration when registrants are engaging with the Commission and the Commission staff is that all registrants who are part of the initiative will be treated equitably. Treating registrants uniformly promotes cooperation, the voluntary production of documents and information, self-reporting, and the prompt resolution of matters." *Id.*

### E.   The SEC's Order

#### 1.   Two Commissioners Deny the Motion.

On April 14, 2025—just days before Paul Atkins was sworn in as Commissioner and Chairman[4]—the Commission denied Apex's motion by

---

[4] SEC Press Release, *Paul S. Atkins Sworn in as SEC Chairman* (Apr. 21, 2025), https://tinyurl.com/4f4z2423.

a vote of 2-1. *In re Certain Off-Channel Commc'ns Settled Orders*, Rel. Nos. 34-102860, IAA-6874, at 1 (Apr. 14, 2025) [hereinafter Order], RE.1, JA005. The Commission did so in a single, omnibus order that denied similar motions brought by most of the other respondents who sought to equalize their undertakings with those contained in the January 2025 Orders. *Id.* at 7, RE.7, JA011 (listing respondents and underlying settled orders). Acting Chair Uyeda and Commissioner Caroline A. Crenshaw were in the majority. Commissioner Hester Peirce dissented. *See infra* pp.24–27.

a.   The Order first determined that the respondents, including Apex, failed "to make the showing necessary to modify the Settled Orders." *Id.* at 2, RE.2, JA006. According to the Order, "parties generally . . . must demonstrate 'compelling' or 'extraordinary' circumstances," and "[r]espondents have made no such showing." *Id.* "Even if" the relevant provisions of Apex's Settled Order were inequitable in light of the significantly less burdensome terms provided to other broker-dealers in the January 2025 Orders, "it would not be a basis for modifying Respondents' Settled Orders." *Id.*

In an attempt to rationalize that conclusion, the Order referred to the Supreme Court's decision in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), which addressed the proper application of Federal Rule of Civil Procedure 60(b)(5)'s standard for amending "a final judgment, order, or proceeding" when "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b). After quoting *Rufo*'s non-exhaustive list of circumstances where modification may be warranted, the Order curtly concluded that "[n]one of these circumstances are present here." Order at 3, RE.3, JA007.

Instead, the Order asserted the only arguably changed circumstance was "that later parties negotiated what Respondents believe to be better settlement terms." *Id.* To the majority's eye, Apex's arguments were simply "[s]ettlor's remorse," no different than any civil litigant or respondent in a standalone SEC enforcement action who, when settling, "accept[s] the risk that comparable cases later could reach different outcomes." *Id.* at 4, RE.4, JA008 (first citing *Cummings v. Greater Cleveland Reg'l Transit Auth.*, 865 F.3d 844, 846 (6th Cir. 2017), then citing *Nemaizer v. Baker*, 793 F.2d 58, 60 (2d Cir. 1986)). The Order asserted, without meaningful analysis, "that other parties and the Commission

22

reached different settlement terms does not establish that the terms in Respondents' agreements were punitive or contrary to the public interest." *Id.* at 4, RE.4, JA008. Throughout, the Order repeatedly referenced the SEC's "strong interest" in the "finality of settlements." *Id.* at 2, RE.2, JA006; *see also, e.g., Id.* at 6, RE.6, JA010 (asserting "compelling interest in the finality of settlements").

**b.** The Order next claimed that Apex and the other respondents "rel[ied] on inapposite or inapplicable Commission authority" in support of their motions to modify. *Id.* at 5, RE.5, JA009.

First, while observing that the SEC had modified settlements to amend undertakings in the past—exactly what Apex had sought—the Order distinguished that precedent on three bases: "(1) that [in *Millennium Partners*] the Division of Enforcement did not oppose modification, (2) that the respondent [there] requested relief more than ten years after the original order, and (3) that the modification [there] would sunset an otherwise indefinite obligation." *Id.* at 5, RE.5, JA009.

Next, the Order disagreed with Apex's position—undisputed by the Division—that multiple provisions of the SEC's Rules of Practice authorized Apex's motion and the relief Apex requested. *Id.* at 5–6, RE.5–6,

JA009–10.  Although the SEC had previously invoked the Rules to grant motions to modify undertakings, the Order without citation to any authority concluded that the Rules were "not grounds for relief" and instead were "inapposite." *Id.* at 5–6, RE.5–6, JA009-10.  Further, the Order asserted—again, with no citation to any SEC rule or precedent, and contrary to the SEC's past practices—that Apex was required to first file a separate motion to reopen before it filed its motion to modify the undertakings.  *Id.* at 5, n.19, RE.5, JA009.

In sum, the Order asserted that "granting the requested relief would undermine the compelling interest in the finality of settlements and thus not serve the interests of justice." *Id.* at 6, RE.6, JA010.

## 2.    Commissioner Peirce Dissents.

Commissioner Hester Peirce dissented, concluding that the SEC should have "grant[ed] the Respondents' motions and modif[ied] the Settled Orders to make the undertakings voluntary in all of them."  Order (Peirce, Comm'r, dissenting) at 1 [hereinafter Dissent], RE.8, JA012.

Contrary to the other majority's assertion that they lacked authority to modify the settlements, Commissioner Peirce concluded that "our rules provide an avenue for relief." *Id.*  Specifically, she noted that "Rule

24

of Practice 100(c) states that the Commission may order 'alternative pro-
cedure[s]' if doing so 'would serve the interest of justice and not result in
prejudice to the parties.'  Additionally, Rule 100(c) provides that the Com-
mission may order 'that compliance with an otherwise applicable rule is
unnecessary.'"  *Id.* (quoting 17 C.F.R. § 201.100(c)).  Thus, regardless of
how other rules might be interpreted or applied, the SEC should have
granted relief because "it is in the interest of justice to employ alterna-
tive procedures and to grant the motions to modify."  *Id.*  Commissioner
Peirce noted that the SEC had done exactly that before in *Millennium
Partners* and in other instances.  *Id.*

In finding that modifying the settlements would be "in the interest
of justice," Commissioner Peirce emphasized that the settlements all oc-
curred as part of a single enforcement sweep.  "Between December 2021
and October 2024," she noted, "the Commission's Off-Channel Communi-
cations enforcement sweep resulted in settlements with more than 100
firms and reaped $2 billion in penalties."  *Id.*  Moreover, the Division of
Enforcement "d[id] not dispute" that "the terms on which most firms set-
tled included nearly identical undertakings."  *Id.*  Nor did the Division of

Enforcement "contest the assertion . . . that FINRA's heighted supervision plans impose costly obligations that go beyond the Commission's requirements in the [January 2025 Orders'] undertakings." *Id.* at 2, RE.9, JA013. Commissioner Peirce thus concluded that even if the SEC's explanation for its settled orders were "sound in those proceedings," the Commission had failed "to explain the differential treatment across firms that were similarly situated." *Id.* at 4, RE.11, JA015.

To illustrate the absence of any explanation for the differential treatment, Commissioner Peirce posed a series of rhetorical questions to the Division and to the majority:

> Why are the undertakings nearly always ordered for firms pre-2025 and voluntary thereafter? Why must the broker-dealer firms that settled before January 2025 submit continuing membership applications to FINRA and be subject to costly heightened supervision plans while the broker-dealer firms that settled in January 2025 are not? And why is heightened supervision, which also imposes costs on FINRA, even necessary for the broker-dealer firms at all?

*Id.* at 4–5, RE.11–12, JA015–16. She then criticized both the Division of Enforcement and the majority for having "offered no answers to these questions." *Id.* at 5, RE.12, JA016.

To the majority's characterization of the motions as mere "settlor's remorse," Commissioner Peirce explained that "something more significant is going on in these proceedings." *Id.* at 5, RE.12, JA016. Specifically, "[w]hen the Commission engages *in enforcement sweeps* that ensnare large numbers of firms across different parts of its regulatory ambit, it should endeavor to ensure both that the remedies it selects are commensurate to the conduct and that it imposes those remedies in a fair and even-handed manner across firms." *Id.* (emphasis added). Moreover, Commissioner Peirce explained, when the SEC "settles on a remedial scheme that results in significantly greater costs to one category of firms, it should do so for well-explained and transparent reasons," and "[t]his need for clear and transparent explanation is only heightened when the Commission chooses to change course in its application of the remedial scheme." *Id.* Because the SEC provided no such "clear and transparent explanation" for its inconsistent remedial scheme, Peirce dissented.

### 3.     Petition for Review

Apex challenged the SEC's Order by timely filing a petition for review with this Court on June 13, 2025. ECF 1-2.

### 4.    June "Clean-Up" Order.

After Apex filed its petition for review with this Court, the SEC issued an order resolving similar motions to modify that were submitted by other respondents to the off-channel communications sweep around the same time as Apex.  *See In re Certain Off-Channel Commc'ns Settled Orders*, Rel. No. 34-103330, at 1 (June 26, 2025) [hereinafter Clean-Up Order].  The SEC provided no explanation for why those motions were omitted from the original, omnibus April 14 Order.

In that Clean-Up Order, the SEC relied on the rationales asserted in the April 14 Order in which it denied Apex's motion to modify.  Citing the Order, the SEC concluded that modification was again inappropriate because "a party's belief that subsequent parties negotiated better settlement terms is not a compelling circumstance that justifies altering terms of a prior settlement."  *Id.* at 2.  Again, Commissioner Peirce dissented.

### SUMMARY OF ARGUMENT

The Commission's Order denying Apex's motion to modify is arbitrary, capricious, contrary to law, an abuse of discretion, and fails to observe procedure required by law.  It must be vacated and "set aside."  5 U.S.C. § 706(2).

As an initial matter, the Order flouted the "bedrock principle of administrative law that an agency must 'treat like cases alike'" and that "administrative agencies must apply the same basic rules to all similarly situated supplicants." *Univ. of Tex. M.D. Anderson Cancer Ctr.*, <u>985 F.3d at 479</u>; *Noranda Alumina, LLC*, <u>841 F.3d at 665</u>. It is indisputable that the SEC imposed different undertakings in Apex's order than in the January 2025 Orders, although they all were part of the same enforcement sweep and involved the same violations of the same rules by similarly situated firms. *See FINRA Collateral Consequences Statement*, *supra*.

But under the law, an adjudicator must always "balance the principle of finality of a judgment with the interest of the court in seeing that justice is done in light of all the facts." *Hesling v. CSX Transp., Inc.*, <u>396 F.3d 632, 638</u> (5th Ci<u>r. 2005</u>). By refusing to modify Apex's order, the SEC arbitrarily opted to keep applying a different set of undertakings applied to "like cases."

Second, the SEC provided no rational justification or adequate explanation for the result: a "remedial scheme that results in significantly greater costs to one category of firms." Dissent at 5, RE.12, JA016. Indeed,

this matter is a veritable case study in all the ways that agency adjudication can violate the APA's requirement of reasoned decisionmaking.

- The Commission failed to provide a "satisfactory explanation" for the particular disparate treatment that Apex complains of. *State Farm*, 463 U.S. at 43. Instead, the Order treated the SEC's interests in the finality of settlements as an overriding consideration that trumps all else—and ignored all authorities to the contrary. In doing so, the SEC failed in its obligation to "*balance* the principle of finality" with competing interests like fairness and consistency. *Hesling*, 396 F.3d at 638 (emphasis added).

- The Commission also totally "failed to consider" the enforcement-sweep context, which is an "important aspect of the problem" raised by Apex. *State Farm*, 463 U.S. at 43. Commissioner Peirce was right. "[S]omething more significant" than the "settlor's remorse" asserted by the majority was "going on in these proceedings." Dissent at 5, RE.12, JA016.

30

- The Commission failed to respond to significant points raised by Apex.  The Order asserted that "the only arguably changed circumstance [Apex] identifie[d] is that later parties negotiated what Respondents believe to be better settlement terms."  Order at 3, RE.3, JA007.  But this is a strawman.  Apex argued that, *as a matter of objective reality*, the SEC had changed its policy.

- The Commission "arbitrarily" deviated from SEC precedent in which the SEC modified undertakings in similar circumstances.  *Noranda Alumina LLC*, 841 F.3d at 665.

- The Commission steadfastly refused to identify the criteria for modification of settled orders.  Rather, the Commission impermissibly embraced a "vague and indecisive" standard, shirking its obligation to "pour some definitional content into . . . the criteria it is applying."  *Rapoport v. SEC*, 682 F.3d 98, 107 (D.C. Cir. 2012); *PDK Lab's Inc. v. DEA*, 438 F.3d 1184, 1194 (D.C. Cir. 2006).

Finally, the Order arbitrarily invented a requirement that Apex file a motion to reopen separate and apart from its motion to modify.  Yet

Rule 200(d) of the SEC Rules of Practice says that a party may file a motion to modify "at any time." 17 C.F.R. § 201.200(d)(1). The Order cited no provision of the SEC rules to support its assertion, and the SEC has not required motions to reopen be filed in prior matters like this. Even assuming there was such a requirement, "[i]f the agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). Because of that failure to follow its own procedures, "any action taken as a result of the proceedings cannot stand." *Pac. Molasses Co. v. FTC*, 356 F.2d 386, 390 (5th Cir. 1966).

For all these reasons, the Petition should be granted and the Order vacated and set aside.

## STANDARD OF REVIEW

This Court must "set aside" the Commission's Order if it finds that the Order is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 15 U.S.C. § 78y(b)(4); 5 U.S.C. § 706(2)(A), (D); *see also Chamber of Com.*, 85 F.4th at 767 (Section 25 of the Exchange Act incorporates

Administrative Procedure Act's standard of review). Accordingly, this Court "review[s] the SEC's answers to purely legal questions *de novo*," while the Commission's findings of facts "are conclusive" but only if such findings are "supported by substantial evidence." *Chamber of Com.*, 85 F.4th at 767; 15 U.S.C. § 78y(a)(4).

An agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" if, *inter alia*, the action:

> [lacks] a rational connection between the facts found and the choice made[,] . . . relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*State Farm*, 463 U.S. at 43. An agency, likewise, "may not apply its precedents arbitrarily," and, where it does "depart from its settled policies," the agency "must offer a reasoned explanation for such departure." *Noranda Alumina LLC*, 841 F.3d at 665 (cleaned up).

An agency also acts in an arbitrary and capricious manner when it fails to follows its own rules. "When an administrative agency promulgates rules to govern its proceedings, these rules must be scrupulously

observed." *Pac. Molasses Co.*, 356 F.2d at 389. "For once an agency exercises its discretion and creates the procedural rules under which it desires to have its actions judged, it denies itself the right to violate these rules. If an agency in its proceedings violates its rules and prejudice results, any action taken as a result of the proceedings cannot stand." *Id.* at 389–90; *accord Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981) (per curiam).

A court "must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'" *Nat'l Ass'n of Priv. Fund Managers v. SEC*, --- F.4th ---, No. 23-60626, 2025 WL 2434051, at *3 (5th Cir. Aug. 25, 2025) (citations omitted). Ultimately, "[t]he APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Thus, a reviewing court "must ensure that 'the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.'" *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 855 (5th Cir. 2022) (quoting *Prometheus Radio*, 592 U.S. at 423).

34

## ARGUMENT

### I.  The Commission's Refusal to Treat Similarly Situated Firms Similarly Is Arbitrary.

"It is a bedrock principle of administrative law that an agency must 'treat like cases alike.'" *Univ. of Tex. M.D. Anderson Cancer Ctr.*, 985 F.3d at 479.  In keeping with that "bedrock principle," "administrative agencies must apply the same basic rules to all similarly situated supplicants." *Noranda Alumina, LLC*, 841 F.3d at 665 (quoting *Henry*, 74 F.3d at 6).  Otherwise, the agency would "merely flit serendipitously from case to case, like a bee buzzing from flower to flower, making up the rules as it goes alone." *Id.*  "Suffice it to say the APA prohibits that approach." *Univ. of Tex. M.D. Anderson Cancer Ctr.*, 985 F.3d at 480.

That goes for remedies too.  In *University of Texas M.D. Anderson Cancer Center*, this Court vacated an administrative order that resulted in "zero penalty on one covered entity and a multi-million-dollar penalty on another" for violations of the exact same rule.  985 F.3d at 480.  The agency's refusal to apply "a comparative standard" was *ipso facto* arbitrary and capricious.  *Id.* at 479; *see also Collins v. SEC*, 736 F.3d 521, 526 (D.C. Cir. 2013) ("Review for whether an agency's sanction is 'arbitrary or capricious' requires consideration of whether the sanction is out

of line with the agency's decisions in other cases."); *Zhang v. Gonzales*, 452 F.3d 167, 173 (2d Cir. 2006) ("[I]t is a fundamental principle of justice that 'similarly situated individuals be treated similarly.'").

Here, the SEC also refused to "treat like cases alike." *Univ. of Tex. M.D. Anderson Cancer Ctr.*, 985 F.3d at 479. Neither the Division nor the majority disputed the fact that Apex's order and the January 2025 Orders concerned materially similar violations of the same SEC rules by the same types of firms. Nor did they dispute that, until January 2025, "the terms on which most firms settled included nearly identical undertakings." Dissent at 1, RE.8, JA012. And they never disputed that the January 2025 Orders impose far less burdensome undertakings than the undertakings Apex was ordered to comply with.

In light of these undisputed facts, Apex's motion to modify its order merely asked that "similarly situated settling firms" be treated similarly with respect to prospective undertakings. Motion at 5, JA057.[5] By deny-

---

[5] Apex did not attempt to revisit the $6 million civil money penalty it paid, even though the January 2025 Orders imposed drastically lower civil money penalties.

36

ing Apex's motion, the SEC opted to keep applying different sets of undertakings to "like cases." As in *University of Texas M.D. Anderson Cancer Center*, the SEC refused to apply "a comparative standard" when doling out remedies pursuant to its off-channel communications enforcement sweep. 985 F.3d at 479.

Worse still, when Apex and others moved to modify the settled orders and, in so doing, gave the SEC the opportunity to equalize the remedies, the SEC knowingly and flatly refused. About this, the SEC was explicit. According to the Order, even if "the later settlements involved similarly situated respondents" and the "terms of those orders were better" than the ones imposed on Apex, "it would not be a basis for modifying Respondents' Settled Orders." Order at 2, RE.2, JA006. The SEC thus disregarded this Court's directive that "administrative agencies must apply the same basic rules to all similarly situated supplicants." *Noranda Alumina LLC*, 841 F.3d at 665.

The SEC's refusal to equalize the undertakings in the same enforcement sweep is especially concerning because the Securities Exchange Act of 1934 authorizes the Commission to impose undertakings on broker-dealers *only if* it finds that such undertakings are "in the public interest."

37

15 U.S.C. § 78o(b)(4).  All of the SEC's orders imposing undertakings pursuant to the off-channel communications sweep therefore necessarily reflect its findings as to the public interest.   But the SEC never once squared its finding that ordering onerous undertakings (and triggering FINRA collateral consequences) on Apex is "in the public interest" while imposing less burdensome undertakings on similarly situated firms for the same violations is also in the public interest.   Instead, the SEC just insisted on maintaining a clearly contradictory and inequitable policy as to what undertakings were "in the public interest."   That is classically arbitrary and capricious.  *See Univ. of Tex. M.D. Anderson Cancer Ctr.*, 985 F.3d at 479–80.

## II.    The Commission Did Not Engage in Reasoned Decisionmaking.

"The Administrative Procedure Act . . . establishes a scheme of reasoned decisionmaking."  *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (citation modified).  To satisfy that standard, an agency must always "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v.*

38

*United States*, <u>371 U.S. 156, 168</u> (1962)); *accord Sierra Club v. EPA*, <u>939 F.3d 649, 664</u> (5th Cir. 2019).

Here, the SEC failed to articulate a reasoned basis for its Order refusing Apex's motion to modify the undertakings.  First, the Commission never defended the harsh undertakings required of Apex on their own terms, instead irrationally treating the "finality" of settlements as an interest superior to all others.  Second, the Commission entirely ignored "an important aspect of the problem" raised by Apex: the enforcement-sweep context. *State Farm*, <u>463 U.S. at 43</u>.  Third, the Commission provided no reasonable response to Apex's showing that the January 2025 Orders were a "changed circumstance" that rendered the prior Settled Order inequitable.  Fourth, the Commission deviated from its precedents that amended inequitable settled orders under similar circumstances and offered only arbitrary justifications for that departure.  Finally, in a telltale sign of arbitrary-and-capricious agency action, the Commission refused to even identify the standard that was necessary for Apex to meet.

These are each ordinary grounds for vacating the Order as "arbitrary and capricious." But, if anything, the APA's requirement for "reasoned decisionmaking" is *more demanding* where, as here, the agency is pursuing a policy of inconsistent treatment of similarly situated persons. *See Univ. of Tex. M.D. Anderson Cancer Ctr.*, 985 F.3d at 479–80 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). As the D.C. Circuit has explained, under the APA, each agency has a "statutory duty . . . to provide some reasonable justification for any adverse treatment relative to similarly situated competitors." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1025 (D.C. Cir. 2018); *see also Burlington N. & Santa Fe Ry. v. Surface Transp. Bd.*, 403 F.3d 771, 776 (D.C. Cir. 2005). For the reasons below, the Commission's Order falls far short of that obligation.

## A. The Commission Fails to Justify the Undertakings, Relying Instead on Conclusory Rationales.

On a fundamental level, the Order is arbitrary and capricious because, as Commissioner Peirce correctly observed, the SEC failed to provide a "satisfactory explanation" for the undertakings the Order refuses to modify. *State Farm*, 463 U.S. at 43. Both the Division of Enforcement

and the Commission majority could not "explain the differential treat-
ment across firms that were similarly situated."  Dissent at 4, RE.11,
JA015.

The Order made no attempt to answer the question of why Apex
was ordered to comply with undertakings, while the January 2025 set-
tlors were not.  The SEC likewise had no explanation for why the "broker-
dealer firms that settled before January 2025 [must] submit continuing
membership applications to FINRA and be subject to costly heightened
supervision plans while the broker-dealer firms that settled in January
2025 [were] not" made to do so.  *Id.* at 5, ER.12, JA016.  Nor did the
Commissioners provide "well-explained and transparent reasons" for a
"remedial scheme that results in significantly greater costs to one cate-
gory of firms."  *Id.*  Such "unexplained inconsistencies" are "hallmark[s]
of 'an arbitrary and capricious change from agency practice.'"  *Data Mktg.
P'ship,* 45 F.4th at 857 (quoting *Encino Motorcars, LLC v. Navarro,* 579
U.S. 211, 222 (2016)); *see also Nat'l Cable & Telecomms. Ass'n v. Brand
X Internet Servs.*, 545 U.S. 967, 981 (2005) ("Unexplained inconsistency
is . . . a reason for holding [agency action] to be . . . arbitrary and capri-
cious . . . .").  And despite the SEC's statutory mandate to ensure that

undertakings are always "in the public interest," the Order nowhere explains why the public has an interest in harsh sanctions for some broker-dealers and lighter sanctions for the others.  15 U.S.C. § 78o(b)(4).

Instead, the Order treated the SEC's interests in the finality of settlements as an overriding consideration that trumps all else.  Like an incantation, the Order again and again repeated the "strong interest in maintaining the finality of settlements" and the "need for finality" to justify the inequitable result it upholds.  Order at 2, ER.2, JA006 (citation modified).  The SEC never considered any countervailing interest.  Crucially, the Order did not even acknowledge, let alone meaningfully address, that "[t]he public interest is served by the consistent and uniform application of [law] to similarly-situated parties." *Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 71 (D.D.C. 2010).

It was irrational for the SEC to treat the supposed finality of settlements as a trump card.  If that interest really were as weighty as the Order says, there would never be a basis for modifying a settled order and fundamental notions of fairness, proportionality, and cost-effectiveness would be irrelevant.  That is not the way the Commission has approached motions to modify in the past, *see, e.g.*, *Millennium Partners*,

42

Rel. No. 34-78364, and it is contrary to the Exchange Act's mandate that undertakings serve a holistic "public interest." 15 U.S.C. § 78o(b)(4).

Nor can the weight the Order placed on vague notions of an interest in "finality" be squared with its reliance on Federal Rule of Civil Procedure 60(b)(5), which empowers courts to modify past orders when the orders' terms are "no longer equitable." Fed. R. Civ. P. 60(b)(5). If the Commission had taken appropriate guidance from the caselaw concerning Rule 60(b)(5), the Order would have acknowledged that relief may be appropriate even in settled actions. *See*, *e.g.*, *Northridge Church v. Charter Twp. of Plymouth*, 647 F.3d 606, 613 (6th Cir. 2011) ("Rule 60(b) is thus just as applicable to motions to modify or vacate consent judgments as it is to motions to modify or vacate other judgments."); *SEC v. Alexander*, No. 06-cv-3844, 2013 WL 5774152, at *2 (E.D.N.Y. Oct. 24, 2013) (explaining that, even in settled actions, relief under Rule 60(b)(5) is appropriate if the movant establishes that the ongoing sanction is no longer equitable).

Further, if the Commission had truly taken cognizance of Rule 60(b)(5) and its caselaw, it would have recognized that simple "finality" is *not* an overriding interest. Rather, "[b]y its very nature," Rule 60(b)

43

"seeks to strike a delicate balance between two countervailing impulses: the desire to preserve the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts." *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir. 1981) (citation modified). Rule 60(b)(5) thus commands adjudicators to "balance the principle of finality of a judgment with the interest of the [tribunal] in seeing that justice is done in light of all the facts." *Hesling*, 396 F.3d at 638. For that reason, finality interests "are not inviolate" and "must yield . . . to the equities of the particular case[.]" *Associated Marine Equip. LLC v. Jones*, 301 F. App'x 346, 348 (5th Cir. 2008) (per curiam); *Lowry Dev., L.L.C. v. Groves & Assocs. Ins., Inc.*, 690 F.3d 382, 385–86 (5th Cir. 2012); *see also Seven Elves*, 635 F.2d at 401 (Rule 60(b) "should be liberally construed in order to do substantial justice.").[6]

---

[6] The Order cites *Cummings v. Greater Cleveland Regional Transit Authority* to argue that courts applying Rule 60(b)(5) have held that "settlor's remorse" or "hindsight" are insufficient basis to grant relief, thereby relieving the Commission of the obligation to balance competing interests. Order at 4 n.14, RE.4, JA008. Setting aside the false notion that Apex's motion was a case of "settlor's remorse," *see infra* pp.45–49, it is notable that the Order finds support from *Cummings* only by clipping the relevant quotation. After first laying down the general principle that "settlor's remorse cannot *alone* justify abandoning" a final judgment, the

By failing to actually weigh the equities, the SEC acted arbitrarily and capriciously.  *See State Farm*, 463 U.S. at 42 (Agency action must be "based on consideration of the relevant factors.").

## B.    The Commission Ignored the "Important" Enforcement-Sweep Context.

The Commission also acted in an arbitrary and capricious manner by failing to evince any consideration of the settlement's place in the broader off-channel communications enforcement sweep.  It is well-established that an agency decision that "entirely fail[s] to consider an important aspect of the problem" is arbitrary and capricious.  *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 199 (5th Cir. 1989) (quoting *State Farm*, 463 U.S. at 43); *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019).  Here, the enforcement-sweep context was an "important aspect" of the matter that the majority ignored.

The Order instead characterized Apex's motion as one motivated by mere "settlor's remorse."  That so profoundly understated the concern as

---

Sixth Circuit explained that "Rule 60(b) offers an *exception* to these principles."  *Cummings*, 865 F.3d at 846 (emphases added).  *Cummings* therefore refutes the proposition that the supposed interest in finality can defeat any attempt to modify a settlement.

to mischaracterize it. *See Am. Sec. Ass'n v. SEC*, No. 23-13396, <u>2025 WL 2092054</u>, at *8 (11th Cir. July 25, 2025) ("Agencies must consider material changes in circumstances . . . ."). Apex is not just another settlor who, on second thought, wishes it had gotten a better deal. *Contra* Enf't Opp'n at 4–5, JA070–71 (falsely comparing Apex to the respondent in *In re Richard D. Feldmann*, Rel. No. 34-77803 (May 10, 2016), who settled and then sought to modify the order to get all the benefits won by parties who took the risk of litigating). And Apex is not a settlor in a discrete, standalone action trying to draw an apples-to-oranges comparison to sanctions imposed in unrelated matters.

For Apex, the context of the enforcement sweep was fundamental to its calculus when it settled. Indeed, the standardization of remedies is one of the points of SEC enforcement sweeps: By giving every respondent the same, predictable sanctions, enforcement sweeps incentivize self-reporting and cooperation and preserve SEC resources. *See* Reply at 7, JA087 (noting Commission's previously "uniform approach . . . that the Ordered Undertakings were a required and non-negotiable component of all settlements related to the Commission's initiative"). The January

2025 Orders upset this common understanding on which Apex (and others) reasonably relied.

So too, the enforcement-sweep context is why the January 2025 Orders rendered continued enforcement of the relevant undertakings imposed in Apex's settlement inequitable. Such undertakings were not inequitable when they applied to all broker-dealers equally. But when some broker-dealers were not prescribed compliance-consultant mandates or heightened FINRA supervision, those broker-dealers won a competitive advantage from the SEC for no reason other than that the SEC had changed its policy in early 2025. *See Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992) ("[I]t is settled law that an agency may be forced to reexamine its approach if a significant factual predicate of a prior decision has been removed." (citation modified)). But for the enforcement-sweep context, Apex's undertakings would be judged only as ad hoc, standalone enforcement, perhaps overburdensome but not obviously *inequitable*. By neglecting to address the critical enforcement-sweep context, the Commissioners "failed to consider" possibly the most "important"—and certainly a foundational—aspect of Apex's claim.

Commissioner Peirce understood the central importance of the enforcement-sweep context in Apex's (and the other respondents') arguments. As she put it in her well-reasoned dissent, the enforcement-sweep context was what differentiated Apex's case from a mine-run case of "settlor's remorse." *See* Dissent at 5, RE.12, JA016 ("[S]omething more significant is going on in these proceedings."). Simply put, the SEC's choice to conduct an enforcement sweep is a choice to act consistently toward all caught up in the sweep. "When the Commission engages in enforcement sweeps that ensnare large numbers of firms across different parts of its regulatory ambit, it should endeavor to ensure both that the remedies it selects are commensurate to the conduct and that it imposes those remedies in a fair and even-handed manner across firms." *Id.* By disregarding the enforcement-sweep context, the Commission ignored these considerations.[7]

---

[7] The enforcement-sweep context is also critical to understanding why the Commission precedent of *In re Michael H. Johnson*, Rel. No. 34-75894 (Sept. 10, 2015), is inapposite. The respondent in *Johnson* sought to align his undertakings with those in unrelated, standalone settled actions.

The Commission's failure to consider the context of the broader enforcement sweep is particularly egregious because the Commission is *itself* responsible for that sweep. As with any agency, the SEC has an "obligation to acknowledge and account for a changed regulatory posture the agency creates." *Nat'l Ass'n of Priv. Fund Managers*, 2025 WL 2434051, at *12 (quoting *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (per curiam)). Here, the Commission was responsible for the sweep, and it was responsible for the January 2025 change in the sweep's policy that occasioned Apex's motion.

Ultimately, the Commission's failure to consider Apex settlement's place in a broader enforcement sweep is a failure to grapple with the *reason* why Apex's set of undertakings became inequitable following the January 2025 Orders. The enforcement-sweep context was thus "an important aspect of the problem" raised by Apex's motion. *Chem. Mfrs. Ass'n*, 870 F.2d at 199. But the Commissioners in the majority provided no indication they considered that fact—a failure that renders the entire Order arbitrary, capricious, and requiring vacatur. *See id.*

### C.   The Commission Erred by Concluding Apex Failed to Show "Changed Circumstances."

An agency has an obligation to "provide a response to significant points" raised by the parties. *Chamber of Com.*, 85 F.4th at 774; *see also PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) ("An agency's failure to respond meaningfully to objections raised by a party renders its decision arbitrary and capricious."). The SEC failed to do so here.

In its filings before the SEC, Apex argued that there were "changed circumstances" that would ordinarily result in modification of the settled order under the parallel Federal Rule of Civil Procedure—Rule 60(b)(5). The January 2025 Orders created those changed circumstances. Before the January 2025 Orders, the SEC had been treating "similarly situated firms . . . similarly," but with the issuance of the January 2025 Orders, the SEC "altered course" and "took a materially different approach to materially similar violations of the same provisions of the federal securities laws by similarly situated firms by eliminating certain costly and burdensome undertakings and compliance requirements." Motion at 3, JA055; *see also* Reply at 3, JA083. Apex argued that the changed state

of affairs—with dissimilar treatment for similarly situated firms—was fundamentally inequitable.

Rather than address Apex's arguments, the Order instead focused on the Supreme Court's decision in *Rufo v. Inmates of Suffolk County Jail*, where the Supreme Court provided a non-exhaustive list of changed circumstances that "may" warrant revision of a settlement. *See* 502 U.S. at 384–85. The Commissioners reproduced that list (and other examples given by *Rufo*) in their Order:

> Modifications may be appropriate, for example, where new factual conditions "make compliance with the decree substantially more onerous"; when the consent decree becomes "unworkable because of unforeseen obstacles"; when enforcement of the decree without modification would be detrimental to the public interest; or when there is a significant change in law.

Order at 3, RE.3, JA007 (quoting *Rufo*, 502 U.S. at 383–92). Treating *Rufo*'s illustrative list as an exhaustive set, the Order contended that Apex failed to argue that any relevant changed circumstances were present. *Id.* That was an error at least twice-over.

First, by its own terms, the list of "factual conditions" in *Rufo* contained merely "example[s]"—not the only factual conditions that may be relevant. *See Bragdon v. Abbott*, 524 U.S. 624, 639 (1998) ("[T]he use of the term 'such as' confirms, the list is illustrative, not exhaustive."); *see*

51

*also United States v. W. Elec. Co.*, 46 F.3d 1198, 1206 (D.C. Cir. 1995) (explaining that it is improper to interpret *Rufo*'s discussion "as if they were part of a detailed code"); *SEC v. Lewis*, 423 F. Supp. 2d 337, 341 (S.D.N.Y. 2006) (rejecting the SEC's "inflexible application of the *Rufo* standards").

Second, Apex did in fact make those arguments. The fundamental thrust of Apex's motion was that the SEC's abrupt and unexpected policy change, which, among other things, reflected a significant change in the SEC's view of what sanctions were necessary to protect the public interest, amounted to a significant change in fact and law (as reflected in the SEC's judgment). Motion at 5–6, 8, JA057–58, JA060. Further, that changed circumstance rendered the continued application of unmodified settled orders detrimental to the public interest *and also* made the burden on Apex substantially more onerous. *See id.* at 10, JA062 (noting the public "has a strong interest in not imposing materially different sanctions on similarly situated firms for essentially the same misconduct in connection with settlements entered into as part of the same Commission initiative"); *id.* at 4–5, JA056–57 (explaining that changed circumstances hurt Apex's competitive position vis-à-vis the rival broker-dealers held

only to the January 2025 undertakings).  The SEC never engaged with those arguments.

Instead of addressing the fact that Apex and others were being treated inequitably, the Order asserted that "the only arguably changed circumstance [Apex and other respondents] identify is that later parties negotiated what Respondents believe to be better settlement terms."  Order at 3, RE.3, JA007.  The Commission adopted the same inapt framing in its June Clean-Up Order. *See* Clean-Up Order at 2 ("[A] party's belief that subsequent parties negotiated better settlement terms is not a compelling circumstance that justifies altering the terms of a prior settlement.").

That is a strawman.  Apex did not argue that a settled order must be modified anytime a respondent forms the subjective "belief that subsequent parties negotiated better settlement terms."  Apex argued that, *as a matter of fact and law*, the SEC had ceased treating similarly situated parties similarly.  Because of those changed circumstances, "[f]undamental notions of fairness" required the SEC to modify Apex's order.  Reply at 3, JA083.  Apex invoked the public interest, the onerousness of

continued enforcement of the undertakings, and the changes in law that each warrant revision under *Rufo*.

By failing to address Apex's actual argument and setting up a strawman instead, the SEC did not meet its burden to "reasonably conside[r] the relevant issues and reasonably explai[n] the decision." *Prometheus Radio*, <u>592 U.S. at 423</u>. The requirement to reasonably consider the relevant issues means that the SEC must "provide a response to significant points" raised by the parties. *Chamber of Com.*, <u>85 F.4th at 774</u>; *see also Efe v. Ashcroft*, <u>293 F.3d 899, 908</u> (5th Ci<u>r. 2002</u>) (An agency must "announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted.") The Order does not evince that it took Apex's arguments seriously.

### D.    The Commission Deviated from Its Precedents, Which Regard "Inequitable" Orders as Warranting Modification.

The Commission's refusal to grant Apex's motion to modify is also arbitrary and capricious because it deviates from a consistent line of precedent in which the SEC modified undertakings that were comparatively inequitable. *See, e.g., In re Millennium Partners, L.P.*, Rel. No. 34-78364

(July 19, 2016) (Commission order granting motion to modify undertakings imposed in settled administrative proceeding); *see also In re F.X.C. Invs. Corp. & Francis X. Curzio*, Rel. No. ID-218 (Dec. 9, 2002) ("If Respondents believed that the 1981 censure [imposed in a settled administrative proceeding] was no longer equitable after [an intervening decision], the burden was on them to file a motion to vacate the 1981 sanction."); *In re Fred F. Liebau, Jr.*, Rel. No. 34-92353 (July 8, 2021) ( "[W]e will grant relief where the equitable need, 'consistent with the public interest and investor protection, warrants vacating or modifying a Commission bar order.'") (order granting relief).

*Millennium Partners* illustrates the SEC's past practice of modifying settled orders when they are no longer equitable. In the mid-2000s, the SEC undertook an enforcement sweep related to market timing trades of mutual fund shares. Among the companies caught in that sweep was Millennium Partners L.P. *In re Millennium Partners, L.P.*, Rel No. 34-52863, 2005 WL 3240598 (Dec. 1, 2005) (settled order). The settled order for Millennium Partners required the company to create and maintain a Compliance, Legal, and Ethics Oversight Committee responsible for formulating its policies and procedures and ensuring their

proper enforcement. *Id.* at 12. Years later, Millennium Partners sought to modify that undertaking. Millennium Partners noted that "in other similar administrative proceedings" issued after Millennium Partners' settlement, the undertakings included specific dates at which they would sunset. Millennium Partners Mot. to Modify at 1–2, File No. 3-12116 (June 13, 2016). The more burdensome undertakings imposed on Millennium Partners *vis-à-vis* other firms who also settled in the sweep put it "at a competitive disadvantage with its peer firms." *Id.* at 6. The SEC, agreeing that it "has frequently included sunset provisions in other similar administrative proceedings," found that "the particular circumstances" merited modifying the settled order. *Millennium Partners*, Rel. No. 34-78364, at 2.

Though *Millennium Partners* is the best-explained example of how the SEC has equalized undertakings to ensure they apply equitably, it is not alone. Rather, on at least four other occasions related to enforcement sweeps, the SEC has modified undertakings to ensure that similarly situated parties were treated equally. *See, e.g.*, *In re Putnam Inv. Mgmt., LLC*, Rel. No. IAA-3600 (May 3, 2013) (removing undertakings agreed to in settled order entered into in market-timing sweep); *In re Mass. Fin.*

*Servs. Co.*, Rel. No. IAA-3312 (Nov. 9, 2011) (same); *In re Janus Cap.
Mgmt., LLC*, Rel. No. IAA-3065 (Aug. 5, 2010) (same); *In re MDC Hold-
ings, Inc.*, Rel. No. 34-39537 (Jan. 9, 1998) (similar).

As Apex explained before the Commission, these precedents all sup-
ported its motion to modify the undertakings. Motion at 7, JA059. Ra-
ther than acknowledging that these precedents supported Apex, the Or-
der described *Millennium Partners* as applying only to "the particular
circumstances present there." Order at 5, RE.5, JA009 (citation modi-
fied). It is no defense for the SEC to assert that it merely evaluates re-
quests to amend undertakings on their particular facts. As this Court
has already explained, "an administrative agency cannot hide behind the
fact-intensive nature of . . . adjudications to ignore irrational distinctions
between like cases." *Univ. of Tex. M.D. Anderson Cancer Ctr.*, <u>985 F.3d
at 480</u>. Were the SEC permitted to evade arbitrary-and-capricious re-
view by insisting that "each case is unique," it could "give free passes to
its friends and hammer its enemies." *Id.* at 480.

Moreover, the three facts the Order finds distinguishing—that (1)
the Division of Enforcement did not oppose the requests, (2) the under-
takings imposed indefinite obligations, and (3) the relevant respondent

57

had complied with the undertakings for at least four years—are irrelevant and arbitrary. Order at 5, RE.5, JA009.

For starters, the Division of Enforcement cannot control the SEC's ability to grant relief. *See Lucia v. SEC*, 585 U.S. 237, 241 (2018) (holding that the authority to enforce the federal securities laws resides in the Commission). And the will of the Division of Enforcement is no substitute for the SEC's obligation to provide reasons for its decisions. *See Am. Petrol. Inst. v. EPA*, 661 F.2d 340, 349 (5th Cir. 1981) (rejecting "administrative ipse dixits").

Nor did the Order explain why the analysis should be different for undertakings that will eventually sunset. Both here and in *Millennium Partners*, the pivotal facts concerned the *inequity* of the movants' settlements in light of the remedies applies to similarly situated parties. The SEC provided no justification for why it would make sense to cut short an inequitable indefinite obligation but leave in place an inequitable obligation that will someday go away. Administrative law requires agencies to "apply the same basic rules to all similarly situated supplicants." *Noranda Alumina LLC*, 841 F.3d at 665. It does not permit the agency to apply an inequitable regime as long as it is temporary.

Moreover, the Order failed to explain why it matters whether a firm seeks modification years or months after settling. If unfair treatment is the concern motivating modification, the relevant moment is when the settlement becomes inequitable. What matters is that similarly situated respondents have had different remedies applied to them, not how long the remedies were in place before the inequity arose. Further, prompt action is usually a reason to grant relief, not deny it. *Cf. Smith v. Davis*, 953 F.3d 582, 590 (9th Cir. 2020) (en banc) ("[E]quity aids the vigilant . . . ." (citation modified)). The Order's invocation of the length of time also cannot be squared with its assertions regarding the overwhelming finality interests it has in its settlements. If anything, the SEC's interests in the finality of settlements only *increase* as a settlement ages.

Further, these cases all belie the Order's assertion that "granting the requested relief would undermine the compelling interest in the finality of settlements and thus not serve the interests of justice." Order at 6, RE.6, JA010. Until the instant order, the Commission's interest in finality has not been the overwhelming trump card the Order treated it as. Rather, in all those instances, the interest in finality was overcome

59

by the more weighty interest in equalizing treatment of similarly situated firms.

An agency "may not apply its precedents arbitrarily," and where it does "depart from its settled policies," the agency "must offer a reasoned explanation for such departure." *Noranda Alumina LLC*, 841 F.3d at 665. The Commission failed to do so here.

### E.     The Commission's Failure to Define the Criteria It Applied Is Arbitrary and Capricious.

An agency's interpretation of its own rules "must not be 'vague and indecisive.'" *Rapoport*, 682 F.3d at 107 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 197 (1947)). Rather, an agency has a basic obligation to provide "some definitional content" for "the criteria it is applying." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 457–58 (5th Cir. 2021); *see also Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005) ("Discretion is not whim, and limiting discretion according to legal standards helps promote the basic principle of justice that like cases should be decided alike."). The Order flunks that standard.

Apex made a clear request to the Commission: to modify aspects of its settlement. In rejecting Apex's request, the Order asserted that "[p]arties *generally* . . . must demonstrate 'compelling' or 'extraordinary'

circumstances to modify a settled order"—a showing the Order claimed Apex did not make. Order at 2, RE.2, JA006 (emphasis added). By qualifying that statement with "generally," the Order conceded that "compelling or extraordinary circumstances" are not necessary conditions for modification. *See United States v. Maciel-Alcala*, 612 F.3d 1092, 1098 (9th Cir. 2010) (noting the word "generally" "implies exceptions"). But the Order said nothing about what other circumstances the SEC would also consider sufficient to support modification. Instead, the Order's interpretation reserved for the SEC the ability to grant (or deny) motions to modify on a whim. Where, as here, "a 'purported standard is indiscriminate and offers no meaningful guidance' to affected parties, it will fail 'the requirement of reasoned decisionmaking.'" *ACA Int'l v. FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018) (quoting *U.S. Postal Serv. v. Postal Regul. Comm'n*, 785 F.3d 740, 754–55 (D.C. Cir. 2015)); *see also Pearson v. Shalala*, 164 F.3d 650, 660 (D.C. Cir. 1999) ("To refuse to define the criteria it is applying is equivalent to simply saying no without explanation.").

The D.C. Circuit's decision in *Rapoport* is instructive. There, the court held the SEC acted arbitrarily and capriciously in an enforcement

61

action where it failed to "state[] with any clarity how it determined" how it would interpret one of its Rules of Practice. 682 F.2d at 107. While the SEC "generally" looked to one factor, the D.C. Circuit found that approach too "vague and indecisive" to satisfy arbitrary-and-capricious review. *Id.* at 104. So too here.

\*     \*     \*

The Order is another instance where, from top to bottom, the SEC's ruling is not the product of reasoned decisionmaking. *See, e.g.*, *Susquehanna Int'l Grp., LLP*, 866 F.3d at 449 (holding that the SEC acted arbitrarily and capriciously where a "lack of reasoned decisionmaking recurs throughout the [SEC's] Order"); *Nat'l Ass'n of Priv. Fund Managers,* 2025 WL 2434051, at \*12 (holding that the SEC acted arbitrarily and capriciously where SEC's "logic is irredeemably illogical"); *Am. Sec. Ass'n*, 2025 WL 2092054, at \*5 (holding that the SEC acted arbitrarily and capriciously where the SEC's order was "internally inconsistent," inconsistent with prior SEC orders, and "provide[d] no good reasons" for its decision). A proper consideration of the facts and law makes plain that Apex has established that it is entitled to the relief it sought. *See Horne v. Flores*, 557 U.S. 433, 447 (2009) ("[O]nce a party carries [its] burden, a

court abuses its discretion when it refuses to modify an injunction or consent decree in light of such changes." (citation modified)).

## III. The Commission's Requirement That Apex File a Motion to Reopen Contradicts Commission Rules and Precedents.

Underscoring the arbitrary nature of the Commission's decision, the Order created an until-now unknown requirement that parties must first file a motion to reopen before they may seek modification of a settled order. *See* Order at 5–6 n.19, JA009–10. That was error that on its own requires vacatur. *See Hall*, 660 F.2d at 119.

The SEC's purported procedural requirement has no basis in law. Indeed, the Order itself never even attempted to locate such a requirement in the SEC's own Rules of Practice. Nor could it, as Rule 200(d) permits the SEC, "upon motion by a party . . . at any time" to "amend an order instituting proceedings to include new matters of fact or law." 17 C.F.R. § 201.200(d)(1). The SEC and the Division of Enforcement have invoked Rule 200(d) to amend undertakings imposed in settled orders. *See In re S.A.C. Capital Advisors*, Rel. No. IAA-4287 (Dec. 3, 2015) (invoking "Rule of Practice 200(d)(1)" to amend the terms of an undertaking imposed in a settled order); *see also In re Petroteq Energy, Inc.*, Rel. No. 34-96117 (Oct. 20, 2022) ("[T]he Division of Enforcement and Petroteq

63

filed a joint motion to amend the [settled order] . . . citing Rule of Practice 200(d)(1) . . . ."). And the SEC has not applied this purported motion-to-reopen requirement in those cases, nor in the many other cases where it has addressed motions to modify sanctions.[8]

The Order never addressed its inconsistent treatment of Apex in this respect, which independently establishes that the Order is arbitrary and capricious. *See Texas*, 137 F.4th at 374 ("Unexplained inconsistency is a reason for holding agency action to be arbitrary and capricious.") (citation modified). Rather, it was the kind of "unfair surprise to regulated parties" that courts do not tolerate. *Kisor v. Wilkie*, 588 U.S. 558, 579

---

[8] Even if there was some technical procedural defect with respect to a purported need to file a motion to reopen, the SEC regularly excuses potential hurdles to relief that arise from mere labels. *See In re Sandeep Goyal*, Rel. No. IAA-4339, at 1 n.8 (Feb. 23, 2016) ("Goyal frames his motion as a request that we '[r]everse the Initial Decision against [him] that has since become the Final Decision' and dismiss this proceeding. We construe his motion as a request to vacate the bar."); *In re Michael Johnson*, Rel. No. 33-9797, at 2 (May 29, 2015) ("Construing Johnson's letter as a motion to modify the terms of the bar, we direct that the parties file opposing and reply briefs pursuant to Rule of Practice 154(b)."). The Order provided no explanation for why it could not treat Apex's motion to modify as also functioning as a motion to reopen. *See Westar Energy, Inc.*, 473 F.3d at 1241 ("If the agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases.").

(2019). In short, the SEC's creation of a new procedural requirement out of whole cloth, in sudden and unexplained deviation from the Commission's precedents, is arbitrary and capricious. *Noranda Alumina LLC*, 841 F.3d at 665.

## CONCLUSION

For the foregoing reasons, this Court should grant the petition and vacate and set aside the Commission's Order.

Dated: September 9, 2025

Respectfully submitted,

/s/ *Christopher R. Mills*

CHRISTOPHER R. MILLS
 Counsel of Record
DAVID S. PETRON
JEREMY D. ROZANSKY
SIDLEY AUSTIN LLP
1501 K St. NW
Washington, DC 20005
Tel: (202) 736-8875
cmills@sidley.com

PHILIP H. DEVOE
SIDLEY AUSTIN LLP
787 Seventh Ave.
New York, NY 10019

*Counsel for Petitioner*
*Apex Clearing Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of September, 2025, an electronic copy of the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service will be accomplished by the appellate CM/ECF system.

Dated: September 9, 2025                     /s/ *Christopher R. Mills*
                                             Christopher R. Mills

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and Fifth Circuit Rule 32.2, this document contains 12,528 words.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.

Dated: September 9, 2025               /s/ *Christopher R. Mills*
                                       Christopher R. Mills

ADDENDUM

# ADDENDUM
# TABLE OF CONTENTS

SEC Rules of Practice R. 100(c),
17 C.F.R. § 201.100(c) ........................................................ Add.1

SEC Rules of Practice R. 200(d),
17 C.F.R. § 201.200(d) ....................................................... Add.2

**SEC Rules of Practice R. 100(c)**
**17 C.F.R. § 201.100(c) – Scope of the Rules of Practice**

(c)    The Commission, upon its determination that to do so would serve the interests of justice and not result in prejudice to the parties to the proceeding, may by order direct, in a particular proceeding, that an alternative procedure shall apply or that compliance with an otherwise applicable rule is unnecessary.

**SEC Rules of Practice R. 200(d)**
**17 C.F.R. § 201.200(d)** – **Amendment to Order Instituting Proceedings**

(d)    *Amendment to order instituting proceedings*

(1)    ***By the Commission.*** Upon motion by a party, the Commission may, at any time, amend an order instituting proceedings to include new matters of fact or law.

(2)    ***By the hearing officer.*** Upon motion by a party, the hearing officer may, at any time prior to the filing of an initial decision or, if no initial decision is to be filed, prior to the time fixed for the filing of final briefs with the Commission, amend an order instituting proceedings to include new matters of fact or law that are within the scope of the original order instituting proceedings.